**Under Seal**

AO 91 (Rev. 11/11)  Criminal Complaint

**ORIGINAL**

# UNITED STATES DISTRICT COURT

for the

Central District of California

```
FILED
CLERK, U.S. DISTRICT COURT

DEC - 4 2019

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION      BY DEPUTY
```

United States of America,

Robert Stahlnecker

Defendant

Case No.   **ED19-0641M**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of January 2019 continuing through November 2019, in the *county of* San Bernardino, in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. §§ 115(a)(1)(B); 875(c) 47 U.S.C. § 223(a)(1)(C) | See attached Affidavit. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Matthew Flood, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   December 4, 2019

_____
*Judge's signature*

City and state:   Riverside, California

AUSA:   Peter Dahlquist:re

HONORABLE SHERI PYM
U.S. Magistrate Judge

**AFFIDAVIT**

I, Matthew Flood, being duly sworn, declare and state as
follows:

## I. **PURPOSE OF AFFIDAVIT**

1.     This affidavit is made in support of a criminal
complaint and arrest warrant for ROBERT STAHLNECKER
("STAHLNECKER") for violations of Title 18, United States Code,
Sections 115(a)(1)(B) (Threatening Federal Officers and
Employees) and 875(c) (Interstate Communications with Threat to
Injure a Person), and Title 47, United States Code, Section
223(a)(1)(C) (Anonymous Telecommunications Harassment).

2.     This affidavit is also made in support of an
application for a warrant to search STAHLNECKER's residence, a
structure on the property located at 979 Decker Road, Twentynine
Palms, California 92277 (the "SUBJECT PREMISES"), as described
more fully in Attachment A.

3.     The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of
Title 18, United States Code, Sections 115(a)(1)(B) (Threatening
Federal Officers and Employees) and 875(c) (Interstate
Communications with Threat to Injure a Person) and Title 47,
United States Code, Sections 223(a)(1)(C) (Anonymous
Telecommunications Harassment), 223(a)(1)(D) (Repeated Telephone
Calls), and 223(a)(1)(E) (Repeated Harassing Communication)
(collectively, the "Subject Offenses"), as described more fully
in Attachment B.  Attachments A and B are incorporated herein by
reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5.    I am a Special Agent with the United States Capitol Police (the "USCP") where I have served since February 14, 2008. I am currently assigned to the USCP Investigations Division, Threat Assessment Section.  I have completed hundreds of hours of training in numerous areas of law enforcement investigation and techniques, including but not limited to the following: the Criminal Investigator Training Program and Uniformed Police Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia; the six-week USCP Dignitary Protection Basic Agent Course; and the four-week USCP Basic Investigator Training Program.  I have received training in search warrant applications, the executions of searches and seizures, computer crimes, computer evidence identification, computer evidence seizure and processing, and various other relevant training.  In my current assignment, I have

investigated numerous cases involving harassing and threatening communications.

### III. SUMMARY OF PROBABLE CAUSE

6.   On August 28, 2019, STAHLNECKER called a United States Congresswoman's office from the phone number (760) 881-5528 ("SUBJECT PHONE NUMBER") and told the staffer who answered the phone, "I'm coming to your fucking office and I'm going to kill you, fuck you."

7.   On September 26, 2019, STAHLNECKER called a United States Senator's office from the SUBJECT PHONE NUMBER and told the staffer who answered the phone, "I am going to come to your office and kill you, you miserable little cunt."

8.   Subpoena results for the SUBJECT PHONE NUMBER revealed the SUBJECT PHONE NUMBER made more than 10,000 calls to government agencies and elected officials between January 2019 and November 2019.  I have contacted some of the offices that STAHLNECKER called most frequently.  The staff working in these offices complain that STAHLNECKER calls repeatedly and berates them.  STAHLNECKER typically complains about a United States Department of Veterans Affairs ("VA") Hospital in Loma Linda, and then launches into profanity-laced, obscene, and offensive tirades.  During the calls, STAHLNECKER generally refuses to provide his name.

9.   During the investigation, I received a "Request for Change of Address" form that STAHLNECKER submitted to the VA on August 21, 2019 (one week before the call making the death threat on August 28, 2019, described above).  On the form,

STAHLNECKER listed his "New Address" as the SUBJECT PREMISES and listed his telephone number as the SUBJECT PHONE NUMBER.  I have spoken with local law enforcement officers in Twentynine Palms, California, who have confirmed STAHLNECKER resides at the SUBJECT PREMISES.  Also, on December 3, 2019 I conducted surveillance at the SUBJECT PREMISES and observed an individual matching STAHLNECKER's physical appearance enter and exit the SUBJECT PREMISES.

## IV. **STATEMENT OF PROBABLE CAUSE**

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   **Investigation of August 28, 2019 Death Threat and Identification of STAHLNECKER as Caller**

11.   On August 28, 2019, a man, later identified as STAHLNECKER, called a United States Congresswoman's office in San Mateo, California three times between 4:01 p.m. and 4:06 p.m. from the SUBJECT PHONE NUMBER.[1]  R.K., a congressional staffer working at the office, answered the phone each time. R.K. observed that the phone's caller identification feature displayed the SUBJECT PHONE NUMBER.

12.   During the first call, STAHLNECKER asked R.K. what the Congresswoman was going to do to address malpractice at the VA Hospital in Loma Linda.  R.K. told STAHLNECKER she was not aware of any issues at the VA Hospital in Loma Linda and that Loma

---

[1] Subsequent investigation of the SUBJECT PHONE NUMBER call records confirmed that there were three calls from the SUBJECT PHONE NUMBER to the Congresswoman's office between 4:01 p.m. and 4:06 p.m on August 28, 2019.

Linda was outside the Congresswoman's district.  STAHLNECKER
then became very angry and said the Congresswoman obviously does
not care about veterans and he should come to the
Congresswoman's office and scream to the world that the
Congresswoman does not care about veterans.  STAHLNECKER then
stated that if he was an illegal, the Congresswoman would be
happy to help him.  He stated words to the effect that "it
doesn't matter that she helped that one veteran with the Feres
Doctrine; she clearly doesn't care."  STAHLNECKER then abruptly
hung up.

13.   Moments later, STAHLNECKER called back and R.K. again
took the call.  STAHLNECKER immediately told R.K. they needed to
call the President so he could do something about the VA.
STAHLNECKER yelled at the staffer for not caring about veterans
and said he was going to come to the office.  STAHLNECKER told
R.K. to get another job and told her to "fuck off" multiple
times before hanging up again.

14.   STAHLNECKER called back a third time and continued
yelling and said words to the effect of, "I'm coming to your
fucking office and I'm going to kill you, fuck you."

15.   The Congresswoman's staff immediately reported the
death threat to law enforcement.  The San Mateo Police
Department dispatched officers to the Congresswoman's office to
ensure the safety of staff and to coordinate a response with
USCP.  The Congresswoman's staff continues to carry a photograph
of STAHLNECKER during public events the Congresswoman attends.
Based on the report, I made a request for location data of the

SUBJECT PHONE NUMBER pursuant to 18 U.S.C. §§ 2702(b)(8), (c)(4), which allows a cell phone provider to provide information in an emergency involving a danger of death or serious physical injury. The location data revealed that the calls were originating near Yucca Valley, California.

16.  Further investigation revealed the SUBJECT PHONE NUMBER was subscribed to a "Robert Stahlmecker" (the name was spelled as "Stahlmecker" and not as STAHLNECKER) and the subscriber information listed an address in Yucca Valley, California.

17.  During my investigation, I also received a copy of a VA "Request for Change of Address" form that STAHLNECKER submitted to the VA on August 21, 2019 (one week before the call making the death threat). On the form, STAHLNECKER listed his VA file number and his social security number. He also listed his "New Address" as the SUBJECT PREMISES and listed his telephone phone number as the SUBJECT PHONE NUMBER.

**B.  Investigation of September 26, 2019 Death Threat and Calls of September 27, 2019**

18.  On September 26, 2019, STAHLNECKER called the Washington D.C. office of a United States Senator from Ohio eight times. During two of those calls, he spoke with L.U., a congressional intern. When L.U. answered, STAHLNECKER demanded to know who he was speaking with and L.U. told STAHLNECKER her first name. STAHLNECKER asked if she was a "lowly intern with no value." L.U. answered that she was an intern. STAHLNECKER demanded to talk with "someone who matters." L.U. told

STAHLNECKER she might be able to connect him with someone else
on the staff who could assist him.  She then asked STAHLNECKER
if he lived in Ohio.  STAHLNECKER told her he did not have to
provide any information because she is a "miserable cunt."  The
intern asked STAHLNECKER not to use profane language and said
she would hang up if he did so again.  STAHLNECKER then said she
was the reason veterans are dying and stated that his social
security number is "go fuck yourself."  STAHLNECKER then hung
up.

19.  Moments later, STAHLNECKER called again and L.U.
answered.  STAHLNECKER again asked L.U. for her name, but
recognizing the same voice, L.U. responded, "sir, we don't
provide that information."  STAHLNECKER began yelling at L.U.
L.U. asked STAHLNECKER for his name, and he replied, "Ben
Dover."  STAHLNECKER asked for L.U.'s name again, and when she
refused, STAHLNECKER stated, "I am going to come to your office
and kill you, you miserable little cunt."  L.U. then asked
STAHLNECKER to provide his phone number, but STAHLNECKER refused
and hung up.

20.  L.U. reported that the caller identification feature
on her phone did not display a number, but the Senator's staff
reported receiving approximately seven consecutive phone calls
beginning at approximately 11:00 a.m. on September 26, 2019.  I
have reviewed subpoena results for the SUBJECT PHONE NUMBER call
records.  The results show the SUBJECT TELEPONHE NUMBER called
the Senator's main line number eight times between 11:01 a.m.
and 11:08 a.m.  The call records for the SUBJECT PHONE NUMBER

also reveal the number dialed included "*67" before the
Senator's main line number.  When a caller dials "*67" before
entering the phone number of the intended call recipient, the
caller's number does not appear on the recipient's caller
identification device.

21.   The next day, on September 27, 2019, STAHLNECKER again
called the Senator's main office line.  And again, L.U. took
STAHLNECKER's call.  STAHLNECKER asked about the Senator's
position on the use of medical marijuana.  L.U. recognized the
voice sounded the same as the calls from the previous day.  L.U.
stated the Senator has not made any public statements on medical
marijuana.  STAHLNECKER then became irate as he lectured L.U. on
the importance of medical marijuana.  L.U. asked for
STAHLNECKER's zip code to log his call.  STAHLNECKER said it
wouldn't "fucking matter any way" because he lived in
California.  L.U. then stated she needed to end the call to
leave the line open for the Senator's constituents.  STAHLNECKER
said it did not matter if she ended the call because he would
just call back and she would have to answer.

22.   Minutes later, STAHLNECKER called again and asked
L.U. for her name.  L.U. replied that she doesn't share that
information.  STAHLNECKER stated that he had talked with
"Allison, Sarah, and some bitch named Francis who almost cried
just a minute ago."  STAHLNECKER became angry when L.U. did not
provide her name because he said he is "keeping a list of the
bitches that hang up on him."

C.   **Investigation Based on Subpoena Results**

23.  I reviewed and analyzed the call records from the
SUBJECT TELEPHONE NUMBER.  The records show that STAHLNECKER
made more than 10,000 calls to government agencies and elected
officials from January 2019 to November 2019.  Among the most
dialed numbers were the VA Complaint line (3,660 calls) and the
United States Senators from California (more than 2,500 calls).
Based on the results, I reviewed prior Capitol Police reports
and conducted further investigation of the SUBJECT PHONE NUMBER.
I also began interviewing employees who work in offices that
received the highest number of calls.

24.  For example, the SUBJECT PHONE NUMBER placed 146 calls
to a United States Congresswoman from California between
September 6, 2019 and October 2, 2019.  I contacted the
Congresswoman's office and learned that at least nine different
employees from the Congresswoman's office had received calls
from the same person and each employee described very similar
conduct.  The victims working in the California Congresswoman's
office report that a male caller would typically call and
complain about the VA Hospital in Loma Linda, and then launch
into a profanity-laced tirade:

　　　　a.   Victim K.H. states that during calls, STAHLNECKER
was hostile and profane, and refused to provide his name or
contact information so K.H. could verify he was a constituent.

　　　　b.   Victim D.R. states that he has been fielding
calls from STAHLNECKER since May 2019.  D.R. states that
STAHLNECKER always avoided identifying himself and would

occasionally say his name was "Bob."   D.R. stated that in the majority of calls, STAHLNECKER called D.R. a "cunt."

c.   Victim B.S. states that he received a call from STAHLNECKER in early October 2019.   During the call, STAHLNECKER stated that the Congresswoman does not care about veterans and is profiting from their deaths.   STAHLNECKER then called B.S. an "asshole," a "cunt," a "son of a bitch," and a "fucker."   Before hanging up, STAHLNECKER yelled something like, "go die fucker!" This experience rattled B.S. because B.S. could tell STAHLNECKER was passionate about his views and B.S. feared STAHLNECKER might come to the office to try to harm him or other members of the staff.

d.   Victim N.M. states she began receiving calls from STAHLNECKER in August 2019.   Originally, the calls were coming from a phone number with a 760 area code (the same area code as the SUBJECT TELEPHONE NUMBER).   Later, the caller identification information was blocked.[2]   N.M. reports that during the calls, STAHLNECKER stated that the Congresswoman and her staff should "be hung for treason."   He also called N.M. a "stupid fucking cunt," an "asshole," and a "fucking bitch."

e.   Victim R.V. states she has had three phone interactions with STAHLNECKER.   In all three calls, STAHLNECKER complained about issues at the VA Hospital in Loma Linda and then called R.V. a "fucking dumbass" and a "cunt."

_____

[2] A review of the call records shows that in September 2019, STAHLNECKER called the Congresswoman's office without first dialing "*67," but then began using "*67" in subsequent calls.

f.    Victim S.B. has taken at least 18 phone calls
from STAHLNECKER.  S.B. specifically recalls a 13-minute call
with STAHLNECKER on October 11, 2019.[3]  In every call, S.B.
reports that STAHLNECKER complains about the VA Hospital in Loma
Linda and calls S.B. a "cunt" and a "bitch."

g.    Victim S.L. reports STAHLNECKER calls almost
every day.  When S.L. asks for STAHLNECKER's name and zip code,
STAHLNECKER begins swearing and calling S.L. stupid and useless.
S.L. reports STAHLNECKER generally complains about the VA
Hospital in Loma Linda.

h.    Victim S.W. reports that STAHLNECKER calls the
office on a daily basis.  STAHLNECKER accuses S.W. of accepting
a paycheck to murder veterans and calls her a "cunt."  S.W.
reports that STAHLNECKER's conduct is very upsetting to her and
the other staff members working in the office.

i.    Victim V.G. reports that he frequently receives
calls from a blocked number and the caller constantly complains
about the VA Hospital in Loma Linda.  V.G. reports that the
caller always refuses to give any contact information other than
his first name, Robert, and states he is a California resident.

j.    In addition to these reports from victims, I have
also listened to three voicemails STAHLNECKER left with the
California Congresswoman's office.  In one voicemail,
STAHLNECKER states that the Congresswoman does not care about
veterans and that her office staffers are "100% cunts."  In

---

[3] The call records show that the SUBJECT PHONE NUMBER called
the Congresswoman's office 3 times on October 11, 2019 and one
of those calls lasted 15 minutes.

another message, STAHLNECKER says the Congresswoman's "office staff treat homeless veterans like fucking garbage" and "you are 100% cunts, fuck you!"

25.  The Subpoena results also show the SUBJECT PHONE NUMBER placed 202 calls to a United States Congressman's office from California between September 6, 2019 and October 2, 2019. One of the staffers in that office, M.C., has been taking calls from STAHLNECKER since June 2019. M.C. reports that STAHLNECKER calls again and again and it becomes overwhelming. M.C. reports that their office puts the office phones in a night service mode to prevent STAHLNECKER from calling, but during those times, the staff cannot field calls from other constituents. Initially, the caller identification feature displayed STAHLNECKER'S number and the staff members recognized the number so it was easier to screen calls. More recently, STAHLNECKER has blocked his number when he makes calls. M.C. says STAHLNECKER makes comments like, "you kill veterans for a paycheck" and "you are all cunts." M.C. reports that he is aware that STAHLNECKER has already been on probation for similar conduct targeting VA employees, and M.C. believes that STAHLNECKER does not care about the consequences of his misconduct.

26.  As another example, a Staff Assistant, K.R., for a United States Senator from West Virginia reported receiving a call from the SUBJECT PHONE NUMBER on October 21, 2019. STAHLNECKER asked K.R. what her position was and she replied that she was a full-time staffer. STAHLNECKER stated she was "worthless" and said "I bet you are uneducated." When K.R.

replied that she had graduated from college with two degrees, STAHLNECKER replied, "Well you don't have to be such a fucking bitch." K.R. asked the caller not to use that type of language and STAHLNECKER replied, "the Senator should be assassinated and you're a cunt." STAHLNECKER then hung up.

27. Other recent complaints to my office about a caller making repeated calls suggest STAHLNECKER is using at least one other phone number or may have changed numbers. Employees from three different congressional staffs have reported receiving calls from (442) 400-6484 and report the caller is STAHLNECKER. The caller told one staffer serving a United States Congressman from Tennessee he was a "fucking cunt" and that he was "Tennessee dumb." Another congressional office received approximately 15 calls from (442) 400-6484 and the caller told the staffer who answered she was a "cunt" and told her to "fuck" herself. Yet another representative reports that a man he believes is STAHLNECKER called his officer 15 times on November 14 and 15, 2019. During seven of the calls, the recipient's phone displayed the number (442) 400-6484 and the rest of the calls displayed a blocked number. In the calls, according to the staffer, the caller used abusive and violent language and refused to identify himself. Investigation of the (442) 400-6484 number is still ongoing.

### D. STAHLNECKER's Previous Investigations and Criminal Convictions for Harassment and Threat Offenses

28. The USCP Threat Assessment Section has been investigating STAHLNECKER for harassing communications since at

least 2009.  Our office has opened approximately 41
investigations of STAHLNECKER involving approximately 53
different elected officials.  In one 2016 investigation,
STAHLNECKER called a United States Congressman and stated that
the Congressman "kills veterans and I'm gonna kill [the
Congressman]."

29.  STAHLNECKER has also been criminally convicted of
harassment and threat offenses.

a.  In 2007, STAHLNECKER was convicted of harassment
in state court in New Jersey.

b.  In 2011, STAHLNECKER was convicted of making
terroristic threats with intent to terrorize in state court in
Pennsylvania.

c.  In 2015, following a trial, STAHLNECKER was
convicted in the United States District Court for the Central
District of California for impeding operations at the VA.  In
that case, the court ordered STAHLNECKER to pay a $250 fine on
October 13, 2015, but STAHLNECKER refused to do so and the Court
issued a warrant for his arrest on May 3, 2016.  On July 13,
2017, STAHLNECKER paid the $250 fine.

d.  In 2017, following a trial, STAHLNECKER was again
convicted in the United States District Court for the Central
District of California for impeding operations at the VA, but
that conviction was overturned on appeal.  STAHLNECKER's
underlying offense conduct in the 2017 case included thousands
of calls by STAHLNECKER to the VA facilities, including calls to
the VA suicide prevention line, to complain about the VA

services and to yell at and verbally abuse employees. The court reviewing the conviction concluded that the statute of conviction (a provision of the Code of Federal Regulations governing disorderly conduct-type offenses) only applied to persons present on VA land and did not apply to telephone calls, email, or text messages made by persons who are not on VA property.

**E.   Investigation of the SUBJECT PREMISES**

30.   During the investigation, I received a "Request for Change of Address" form that STAHLNECKER submitted to the VA on August 21, 2019. On the form, STAHLNECKER listed his "New Address" as the SUBJECT PREMISES. I have spoken with local law enforcement officers in Twentynine Palms, California who have interviewed residents living at the main structure at 979 Decker Road, Twentynine Palms, California 92277. Those residents have confirmed that STAHLNECKER resides in a structure on the northside of that property. Also, on December 3, 2019, I conducted surveillance at the SUBJECT PREMISES (979 Decker Road, Twentynine Palms, California 92277), and observed an individual matching STAHLNECKER's physical description enter and exit a structure located at 979 Decker Road, Twentynine Palms, California 92277, north of the main residence on the property. The SUBJECT PREMISES is the same structure local law enforcement identified as STAHLNECKER's residence.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

32.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress STAHLNECKER's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of STAHLNECKER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

34.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. **CONCLUSION**

35.  For all of the reasons described above, there is probable cause to believe that STAHLNECKER has committed violations of Title 18, United States Code, Sections 115(a)(1)(B) (Threatening Federal Officers and Employees) and 875(c) (Interstate Communications with Threat to Injure a

Person), and Title 47, United States Code, Section 223(a)(1)(C) (Anonymous Telecommunications Harassment).   There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A.


_____
Matthew Flood, Special Agent
United States Capitol Police


Subscribed to and sworn before me
this __4th__ day of December, 2019.


_____
UNITED STATES MAGISTRATE JUDGE


20