NICOLA T. HANNA
United States Attorney
JOSEPH B. WIDMAN
Assistant United States Attorney
Chief, Riverside Branch Office
PETER DAHLQUIST (Cal. Bar No. 285548)
ROBERT S. TRISOTTO (Cal. Bar No. 314178)
Assistant United States Attorneys
Riverside Branch Office
    3403 10th Street, Suite 200
    Riverside, California 92501
    Telephone: (951) 276-6267/6211
    Facsimile: (951) 276-6202
    E-mail:    Peter.Dahlquist@usdoj.gov
               Robert.Trisotto@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>ROBERT ERIC STAHLNECKER,<br><br>              Defendant. | No. ED CR 19-0394(A)-SVW<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ROBERT ERIC STAHLNECKER; DECLARATION OF PETER DAHLQUIST; EXHIBIT<br><br>Sentencing Date:   May 4, 2020<br>Sentencing Time:   11:00 a.m.<br>Location:     Courtroom of the Hon. Stephen V. Wilson |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Peter Dahlquist, hereby files its Sentencing Position.

///

///

///

1     This Sentencing Position is based upon the attached Memorandum

2 of Points and Authorities, the Declaration and Exhibit, the files and

3 records in this case, the United States Probation Office's

4 Presentence Investigation Report, and such further evidence and

5 argument as the Court may permit.

6  Dated: April 6, 2020              Respectfully submitted,

7                                    NICOLA T. HANNA
8                                    United States Attorney

9                                    JOSEPH B. WIDMAN
10                                   Assistant United States Attorney
                                     Chief, Riverside Branch Office
11
12                                       */s/ Peter Dahlquist*
                                     PETER DAHLQUIST
13                                   ROBERT S. TRISOTTO
                                     Assistant United States Attorneys
14
15                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
16

17

18

19

20

21

22

23

24

25

26

27

28

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Since 2007, defendant Robert Eric Stahlnecker ("defendant") has been convicted five times for verbally abusing and threatening government employees.  In this case, while investigating two death threats defendant made against government employees, United States Capitol Police ("USCP") agents discovered that defendant had made more than 10,000 calls to government agencies and elected officials in 2019 including abusive, harassing, and threatening calls.  A jury found defendant guilty of five felonies: one count of making a threat through interstate commerce and four counts of anonymous telecommunications harassment.  The jury acquitted defendant on two counts of threatening public officials.  The convictions in this case represent a small fraction of defendant's decade-long campaign to abuse and threaten government employees.

The government agrees with the Probation Officer that defendant's Guidelines range is 21 to 27 months' imprisonment.  The government respectfully requests the Court sentence defendant to a high-end Guidelines sentence of 27 months' imprisonment, a 3-year term of supervised release, and a $600 special assessment.  A sentence of 27 months' imprisonment and a 3-year term of supervised release is warranted because prior convictions have not deterred defendant nor protected the public from his abuse and threats.

## II.   STATEMENT OF FACTS

### A.   The Offense Conduct

Defendant made more than 10,000 calls to government agencies and elected officials in 2019.  (ECF No. 68, Presentence Investigation Report, ("PSR") ¶ 6.)  Employees who fielded his calls complained

that defendant launched into profanity-laced, obscene, and offensive tirades. (*Id.*)  Among those 10,000 calls were the threats and abusive calls charged in the First Superseding Indictment:

- Count 1: On August 29, 2019, after a series of calls, defendant threatened R.K. by saying, "I'm coming to your fucking office and I'm going to kill you, fuck you." (*Id.* ¶ 11.)  R.K. testified that she understood the death treat to be a serious expression and reported the death threat to law enforcement.  R.K.'s supervisor also knew the death threat was serious because R.K. appeared "very, very, worried."  (Dahlquist Decl., Ex. 1.)  Federal and local law enforcement responded to protect the Congresswoman and her staff and tried to identify defendant and verify his location.  In addition, the Congresswoman's staff closed their branch office, turned the lights off, and directed employees to exit out a backdoor.  (Dahlquist Decl., Ex. 1; PSR ¶ 39.)  The jury acquitted defendant on this count. (ECF No. 53.)

- Counts 2 through 4: On September 26, 2019, after a series of calls, defendant threatened L.U. by saying, "I am going to come to your office and kill you, you miserable little cunt." (*Id.* ¶ 13).  In one call, defendant identified himself as "Ben Dover," which the victim understood to be a sexually suggestive, degrading pun.  (*See id.*)  The jury acquitted defendant on count two, a threat against a federal official, but convicted him on count three, which alleged the same conduct as an interstate threat.  (ECF Nos. 25, 53.)  The jury also convicted defendant on count

2

four, which alleged the same conduct as anonymous telecommunications harassment.

- Count 5: On September 27, 2019, defendant abused and harassed L.U. by boasting that he had made one of her colleagues, "some bitch," cry and that he was "keeping a list of the bitches that hang up on him." (*Id.* ¶ 16.)

- Count 6: On October 21, 2019, defendant abused, harassed, and threatened K.R. by calling her "worthless" and "uneducated." (*Id.* ¶ 17.) Defendant told K.R. that she didn't "have to be such a fucking bitch" before telling her, "the Senator should be assassinated and you're a cunt." (*Id.*)

- Count 7: On October 25, 2019, defendant abused and harassed A.F. by telling her to "go fucking die" and that she could help him by "going away and dying, preferably very painfully so [she could] recognize that [she was] a fucked-up person." (*Id.* ¶ 18.)

- Count 8: On November 18, 2019, abused and harassed D.B., a resident of Tennessee who testified at trial with a Southern accent, by refusing to provide his name and saying "[t]hat is irrelevant you fucking cunt; you are Tennessee dumb." (*Id.* ¶ 19.)

At trial, the government also introduced voicemail messages defendant left with a California Congresswoman's office in which defendant said the employees in that office are "children who act like cunts" and "100% cunts." (See *id.* ¶ 30.)

**B.   Charged Conduct is Representative of Overall Conduct**

The evidence presented at trial represents a fraction of defendant's threats, abuse, and harassment.  Over half of defendant's calls in 2019 were to the Veterans Affairs complaint line (3,600 calls) and United States Senators from California (2,500 calls). (*Id.* ¶ 7.)  The USCP investigation focused primarily on interstate calls to Congressional offices so agents did not investigate the majority of defendant's conduct.  Nevertheless, interviews of some of the offices defendant called most frequently revealed a pattern of behavior consistent with the charged conduct.  For example, defendant placed 146 calls to a California Congresswoman's office and nine employees reported defendant abused and harassed them with profanity-laced tirades.  Defendant said things like, "go die fucker," and said the Congresswoman should "be hung for treason."  (*Id.* ¶¶ 21-30.) Defendant's constant, abusive calls caused at least one call recipient to fear for his life because he was afraid defendant "might come to the office to try to harm him or other members of the staff." (*Id.* ¶ 23.)

Other offices ignored defendant's calls or put their phones on "night service" mode in an effort to discourage him from calling. (*Id.* ¶ 31.)  Defendant recognized his conduct was abusive and told one congressional employee who asked him to stop, "wouldn't you rather me be verbally abusive to staff than violent?"  (*Id.*) Congressional staffers who fielded these calls were discouraged because they felt powerless to stop defendant.  (*Id.*)

Defendant's call records also show that his threatening and abusive conduct extended to local elected officials.  (*Id.* ¶ 32.) California Highway Patrol, the local agency responsible for

4

investigating threats to state officials, interviewed a handful of employees who work for local officials.  One staffer reported that their office gets frequent calls from defendant that "usually lead to death threats."  (*Id.*)

### C.   Over Ten Years of Similar Conduct

USCP has been investigating defendant's harassing and threatening calls since 2009.  (*Id.* ¶ 33.)  USCP has opened 41 investigations of defendant involving at least 53 elected officials. (*Id.*)  Among the incidents USCP investigated was a threat defendant made when he stated he was "gonna kill" a California Congressman. (*Id.* ¶¶ 33, 99.)  These 41 USCP reports do not reflect defendant's threats and abuse targeting local officials.  But defendant's criminal history shows that he has engaged in similar harassing and threatening behavior resulting in convictions for harassment, terroristic threats, disorderly conduct, and for making annoying telephone calls.  (Id. ¶¶ 92-95.)  Defendant also had a misdemeanor conviction from the Central District of California overturned on appeal in a case in which defendant made repeated profane and derogatory calls to suicide prevention workers, preventing them from doing their jobs.  (*Id.* ¶ 96.)

### III. SENTENCING GUIDELINES CALCULATIONS: RANGE OF 21 to 27 MONTHS

The government agrees with the Probation Officer's calculations of a total offense level of 15 and a Criminal History Category of II. The Probation Officer's offense level calculation is as follows:

///

///

| | | |
|---|---|---|
| Adjusted Offense Level: | 12 | U.S.S.G. § 2A6.1(a)(1) |
| Multiple Count Adjustment: | +3 | U.S.S.G. § 3D1.4 |
| **Total:** | **15** | |

(PSR ¶¶ 47-88.)  The defendant falls within Criminal History Category II for accumulating three criminal history points.  (*Id.* ¶¶ 96-97.)  The resulting Guidelines range based on an offense level of 15 within Criminal History Category II is 21 to 27 months' imprisonment.  (*Id.*)

**IV.  GOVERNMENT'S RECOMMENDED SENTENCE: 27 MONTHS' IMPRISONMENT AND 3 YEARS' SUPERVISED RELEASE**

The Sentencing Guidelines are the "starting point and the initial benchmark" for sentencing.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  After calculating the Guidelines range, the Court must consider "the nature and circumstances of the offense," and "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  The Court should then consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).  The Court should impose a sentence that is sufficient, but not greater than necessary, to satisfy these statutorily prescribed sentencing objectives.  18 U.S.C. § 3553(a).

6

**A.   27 Months' Sentence Appropriate**

A court should consider the nature and circumstances of the offense and the history and characteristics of defendant. *See* 18 U.S.C. § 3553(a)(1).  A sentence of 27 months' imprisonment and 3 years' supervised release is appropriate because prior convictions for nearly identical conduct have failed to deter defendant or protect government employees from his threats and harassment.  Sadly, for over a decade, defendant has compulsively berated and threatened government employees, and his conduct has escalated, resulting in felony convictions in this case.

The impact of defendant's decade-long campaign of abuse is difficult to quantify.  His threats scare victims, prompt emergency response from law enforcement agencies, and disrupt government operations.  At trial, two victims testified that they understood defendant's death threats as serious statements, and justifiably, were afraid.  The victims reported the death threats to their supervisors and to law enforcement.  Law enforcement and Congressional staff then used resources to identify and find defendant and to guarantee the safety of the federal officials and their staffs.  With the threat to the office of a Congresswoman in San Mateo California, R.K. testified that she immediately notified USCP, her supervisor, and local authorities.  R.K.'s supervisor also perceived the death threat as serious because R.K. appeared to him to be "very, very, worried" and he could tell something was wrong. (Dahlquist Decl., Ex. 1.)  The supervisor then directed staff in the office to turn off the lights in the office and not answer the phones.  He further directed staff to use the backdoor of the office. The supervisor instructed the staff to take these safety precautions

7

because he did not know where defendant was located when he

threatened R.K. and believed the threat was credible.  (*Id.*)

Even defendant's behavior that fell short of explicit death threats disrupted government functions.  Call recipients could not receive calls from other callers while defendant monopolized phone lines with repeated calls.  Call recipients answered calls and tried to deescalate defendant, or they would ignore his calls or put phones on "night mode" so the calls went straight to voicemail.  If the calls went to voicemail, defendant left abusive and menacing messages, which were then screened along with all other messages. The repeated calls and menacing messages were demoralizing and frustrating to government employees who already face a challenging task of trying to appease frustrated callers.

**B.   Conditions of Release are Appropriate**

This Court has wide discretion to impose a condition of supervised release as long as the condition (1) is "reasonably related to the goals of deterrence, protection of the public, and/or defendant rehabilitation" considering his offense of conviction and his history and characteristics, and (2) "involve[s] no greater deprivation of liberty than is reasonably necessary to achieve those goals."  *United States v. Wolf Child*, 699 F.3d 1082, 1090 (9th Cir. 2012) (citing 18 U.S.C. § 3583(d)); *United States v. Rearden*, 349 F.3d 608, 618 (9th Cir. 2003).

The government concurs with the Probation Officer's suggested conditions of supervised release intended to protect the victims, protect the public, and monitor defendant's conduct to ensure he is not committing new offenses:

- ▪ Condition No. 10: The defendant shall not block his telephone number when calling government officials and shall disclose his first and last name when calling.
- ▪ Condition No. 11: The defendant shall provide a copy of his telephone bills and records to his Probation Officer as directed by the Probation Officer.
- ▪ Condition No. 12: The defendant shall not contact the victims . . . or any of the offices of the representatives for whom the victims worked . . . by any means including in person, by mail or electronic means, or via third parties. If any contact occurs, the defendant shall immediately leave the area of contact and report the contact to the Probation Officer within 24 hours of the contact.

(See ECF No. 67, Disclosed Recommendation Letter, at 2-3, 8.)  These conditions are reasonable restrictions based on the nature of the offense and defendant's history of committing similar crimes using his telephone.  These restrictions also protect the victims and other government employees from further crimes.  (*See id.* at 8-9).

These conditions also "involve no greater deprivation of liberty than is reasonably necessary." *See Rearden*, 349 F.3d at 618.  The conditions still permit defendant to call government agencies and voice his concerns.  He is only prohibited from doing so anonymously. Defendant is also only restrained from calling specific offices and he is not a constituent of any of the representatives listed in that condition.  Thus, that restriction does not implicate a significant liberty interest and is tailored to the specific nature and circumstances of this case.  *See id.*

1      **C.   Disparities Can be Avoided by Guidelines Range Sentence**

2      The Court should minimize sentencing disparities among similarly

3 situated defendants.  18 U.S.C. § 3553(a)(6).  One way courts ensure

4 consistent sentences for similarly situated defendants is by applying

5 the Guidelines uniformly.  *See United States v. Treadwell*, 593 F.3d

6 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was

7 correctly calculated, the district court was entitled to rely on the

8 Guidelines range in determining that there was no 'unwarranted

9 disparity' . . . ."); *see also Gall v. United States*, 552 U.S. 38, 54

10 (2007) ("[A]voidance of unwarranted disparities was clearly

11 considered by the Sentencing Commission when setting the Sentencing

12 Guidelines ranges.").  A Guidelines-range sentence is reasonable even

13 where a defendant has endured challenges in life.  *See United States*

14 *v. Carter*, 560 F.3d 1107, 1121-22 (9th Cir. 2009) (finding the

15 imposition of a within-Guidelines sentence reasonable despite

16 defendant's youth, prior non-violent criminal history, and difficult

17 childhood because nothing about those circumstances placed the

18 defendant outside the heartland of similar characteristics and

19 circumstances contemplated by the Guidelines).  Thus, a Guidelines-

20 range sentence of 27 months' imprisonment is appropriate here where

21 defendant does not fall outside the "'minerun of roughly similar

22 cases' considered by the Sentencing Commission in formulating the

23 Guidelines."  *Carter*, 560 F.3d at 1121-22.

24 **V.  CONCLUSION**

25      For the foregoing reasons, the government respectfully requests

26 that this Court sentence defendant to 27 months' imprisonment

27 followed by a 3-year term of supervised release, and a $600 special

28 assessment.

**<u>DECLARATION OF PETER DAHLQUIST</u>**

I, Peter Dahlquist, declare as follows:

1.   I am an Assistant United States Attorney in the Central District of California and I am currently assigned to the above-captioned matter.

2.   Attached as Exhibit 1 are true and correct copies of documents relating to the August 29, 2019 calls defendant placed to the San Mateo, California office of a United States Congresswoman.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Riverside, California, on April 6, 2020.

_____
PETER DAHLQUIST