1         UNITED STATES OF AMERICA
          UNITED STATES DISTRICT COURT
2         CENTRAL DISTRICT OF CALIFORNIA
               WESTERN DIVISION
3
                   - - -
4         HONORABLE STEPHEN V. WILSON
     UNITED STATES DISTRICT JUDGE PRESIDING
5                  - - -

6
     UNITED STATES OF AMERICA,          )
7                                       )
                    PLAINTIFF,          )
8                                       )
     VS.                                )    CASE NO.:
9                                       )    CR 19-394-SVW
     ROBERT STAHLNECKER,                )
10                                      )
                    DEFENDANT.          )
11                                      )
     _____)
12

13

14
               REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                MONDAY, FEBRUARY 3, 2020
16
                 LOS ANGELES, CALIFORNIA
17

18

19

20

21

22
               LAURA MILLER ELIAS, CSR 10019
23             FEDERAL OFFICIAL COURT REPORTER
               350 WEST 1ST STREET, ROOM 4455
24             LOS ANGELES, CALIFORNIA 90012
                    PH:  (213)894-0374
25

```
 1

 2    APPEARANCES OF COUNSEL:

 3
      ON BEHALF OF PLAINTIFF:
 4

 5              UNITED STATES ATTORNEY'S OFFICE

 6              BY: PETER DAHLQUIST

 7                  ROBERT TRISOTTO

 8              ASSISTANT UNITED STATES ATTORNEYS

 9              312 N. SPRING STREET

10              LOS ANGELES, CALIFORNIA 90012

11

12

13    ON BEHALF OF DEFENDANT:

14

15              DAVID REED, ESQ.

16              3699 WILSHIRE BOULEVARD

17              SUITE 850

18              LOS ANGELES, CA 90010

19

20

21

22

23

24

25
```

1

2                                  INDEX

3

4        PROCEEDINGS                                    PAGE

5

6        PRETRIAL CONFERENCE                              4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 3, 2020; 3:21 P.M.

 2                             -  -  -

 3              THE CLERK:  Item No. 10.

 4              Case No. CR 19-394.

 5              United States of America versus Robert Stahlnecker.

 6              Counsel, please state your appearances.

 7              MR. DAHLQUIST:  Good afternoon, Your Honor.  Peter

 8   Dahlquist and Robert Trisotto on behalf of the United States.

 9              MR. REED:  And good afternoon, Your Honor.  David

10   Reed on behalf of the Mr. Stahlnecker.  They're bringing him

11   at this time, Your Honor.

12              May Mr. Stahlnecker have a seat?  I was thinking

13   we're gonna have a status hearing.  It's not a sentencing or

14   anything.

15              THE COURT:  Yes, he can be seated.

16              MR. REED:  I appreciate that, Your Honor.

17              THE COURT:  This is a pretrial conference with

18   respect to a jury trial which is set to begin next Tuesday;

19   is that correct?

20              MR. DAHLQUIST:  Yes, Your Honor.

21              THE COURT:  And there are a number of issues to be

22   addressed.  Let me begin with the arguments regarding one of

23   the statutes at issue 18 United States Code 115(a)(1)(B), and

24   there seems to be a dispute regarding whether the government

25   in the jury instructions can refer to the statute as the
```

 1    defendant being an employee or an officer.

 2            The section that is incorporated in the previously

 3    mentioned Section 115(a) is 18 United States Code

 4    Section 1114 and that statute does use the term officer or

03:24PM 5    employee in a case where it's obvious that the defendant is

 6    not an officer, it appears that the Court should use the term

 7    employee in the jury instruction.

 8            What argument do you make to the contrary,

 9    Mr. Reed?

03:24PM10            MR. REED:  Your Honor --

11            THE COURT:  Why don't you stand at the lectern

12    because --

13            MR. REED:  I will, Your Honor.

14            THE COURT:  -- a lot of these questions are for

15    you.

16            MR. REED:  Yes, Your Honor.

17            One of our concerns, and the first minor concern is

18    that when this case was indicted, the first superseding

19    indictment has the language that the defendant is charged,

03:25PM20    defendant is charged with threatening government employees.

21    That's technically not what he's charged with.  He's charged

22    with threatening government officials.  If you read the

23    language of the statute, it's right there.

24            Now, granted, the statute does incorporate by

03:25PM25    reference a list of people who are covered under 115 and

that's through 1114 as the Court said, but the defendant is
technically charged with threatening government officials.
So the first issue that I was going to raise with the Court
is that it's my experience in trying cases before the court
that the court doesn't usually send the indictment back to
the jury for them to inspect.  Is that still the Court's
practice?

THE COURT:  Generally, it is because the jury is to
be guided by the jury instructions not the indictment.  And
so if that's a concern, it will be alleviated by the fact
that the indictment won't go back.  I mean, the elements have
to be proven, each element, and whether he was, well, let me
look at that again.  Just one moment.

Maybe I need some clarification from the government
first before I continue with your questions.  In addressing
Section 115 which necessarily involves addressing 1114, are
all the alleged victims interns or do they have different
positions in the governmental offices.

MR. TRISOTTO:  Your Honor, the victims, there is
one intern and the other four are staff members.  But I would
just clarify although, her title was an intern paid, she was
a paid government employee during that time period.  She
signed and filled out official forms to that effect so she in
our position is she is a federal employee.

THE COURT:  So you would not have to get to the

```
 1    assist question.
 2              MR. TRISOTTO:  That's our position, Your Honor,
 3    correct.
 4              THE COURT:  Well, I mean, it's your position
 5    because you say the evidence will support that she signed
 6    documents which made her an employee.
 7              MR. TRISOTTO:  Correct Your Honor.
 8              THE COURT:  In other words, she was paid?
 9              MR. TRISOTTO:  That's correct.
10              THE COURT:  And there was withholding?
11              MR. TRISOTTO:  To our understanding, correct.
12    Your Honor, I haven't -- I haven't spoken with her directly
13    about whether there was withholding.
14              THE COURT:  The trial is next week.  You need to
15    talk to your witness.
16              MR. TRISOTTO:  We do understand she was a paid
17    intern for the entire period she was there.
18              THE COURT:  And what did the other employees do?
19    Were these legislative offices?  Congressional offices?  One
20    was a sheriff.  What type of offices were they?
21              MR. TRISOTTO:  So they were all staff members for a
22    combination of congressman, congresswomen and senators.
23              THE COURT:  I saw the mention of a sheriff there
24    somewhere.  Did I misread that?
25              MR. TRISOTTO:  Your Honor, there were police
```

```
 1    involved in the --
 2            THE COURT:  Oh, no.  You know, something, my error.
 3    I was reading quickly and what I thought was sheriff was
 4    actually the name of a senator Sharon Brown.  My mistake.  So
 5    they're all senatorial offices, congressional offices.
 6            MR. TRISOTTO:  Well, Your Honor, they're staff
 7    members who worked for Congressional representative.
 8            THE COURT:  And were they located locally or in
 9    Washington?
10            MR. TRISOTTO:  It was a combination.  So you have,
11    uh, some were in Washington, DC in those offices.  There were
12    others, there's one in Tennessee office, in the
13    local Tennessee office, and there is one in California as
14    well.
15            THE COURT:  But all the phone calls were made from
16    California.
17            MR. TRISOTTO:  That's correct, Your Honor.
18            THE COURT:  And it appears to me not that it
19    necessarily precludes the form of indictment that the
20    statutes are overlapping to some extent.  They all seem to
21    convey a similar way of charging the same set facts; correct?
22            MR. TRISOTTO:  That's correct, Your Honor.
23            THE COURT:  In other words, the set of fact you're
24    going to rely on, will in your view fit the three different
25    statutes.
```

UNITED STATES DISTRICT COURT

1          MR. TRISOTTO:  That's correct, Your Honor.

2          THE COURT:  Any reason why you decided to do it

3    that way?

4          MR. TRISOTTO:  With respect to, uh, just to make

03:31PM 5    sure I understand your question, Your Honor, that's with

6    respect to including the language federal employee?

7          THE COURT:  Yes.

8          MR. TRISOTTO:  Your Honor, I think it's a clarity

9    issue and to avoid confusion with the jury.  I mean by

03:31PM 10   putting that language directly into the indictment, it avoids

11   the potential juror confusion and it's consistent with the

12   language of the statute which incorporates by reference

13   Section 1114.

14         THE COURT:  But, I mean, I'm not suggesting that

03:32PM 15   there will be confusion, but if anything, it seems more

16   confusing because looking at the threat by interstate

17   commerce charge, 18 United States Code 875 C, it simply says

18   the transmitting of a telephonic communication containing a

19   threat to injure a person transmitted with the purpose of

03:32PM 20   using the threat or knowledge that it would be viewed as a

21   threat.  That seems perfectly plain.  Section 115, while it

22   may very well fit the facts here, is more convoluted.

23         Does one statute have a different penalty?

24         MR. TRISOTTO:  Yes, Your Honor, they do.

03:32PM 25         THE COURT:  Well, what penalties?  What is the

1    difference in penalties?

2            MR. TRISOTTO:  Your Honor, my colleague would be

3    able to answer those questions for you.

4            THE COURT:  All right.

03:33PM 5        MR. DAHLQUIST:  Your Honor, the statutory maximum

6    penalty for a violation of 18 U.S.C. Section 115 is ten years

7    if it's an assault, if it's a threat to murder.  Then the

8    maximum is six years if it's a threat to assault.

9            THE COURT:  And what about Section 875 C or

03:33PM 10   223(a)(1)(C)?

11           MR. DAHLQUIST:  The maximum for 221, I believe, is

12   two years and I'm not a hundred percent.  And I don't know

13   what the statutory maximum is for 875 C.  For a point of

14   clarification is one of the calls which is charged as Count 1

03:33PM 15   occurred in California and so there was not a viable charge

16   under 875 C for that particular victim.

17           THE COURT:  I see because that wasn't interstate.

18           MR. DAHLQUIST:  That's correct, Your Honor.  So

19   that conduct is not charged as a violation of 875 C or of the

03:33PM 20   223.

21           THE COURT:  I understand.

22           And the defendant, I'll get back to Mr. Reed in a

23   minute, but while I have you, I want to address another

24   question concerning the defense argument that a threat, in

03:34PM 25   order to constitute a threat has to have an identifiable

victim.  And that seems to be one of the arguments that since the defendant didn't know the identity of the person that he was allegedly threatening, it can't constitute a threat.

Mr. Reed, are you arguing that as a matter of law or as an argument to the jury?  Because if it's an argument to the jury, I think it's very permissible.  In other words, to say to the jury in your evaluation whether it could have been a threat or not, if he didn't know who he was speaking to, that could be a factor among others in deciding whether or not it was a genuine threat.  But as a matter of law, what support do you have for your argument?

MR. REED:  Your Honor, as a matter of law, that's our argument and cases, in other words, if the Court hears that -- I'm not gonna -- we're not gonna find out until the trial occurs whether or not the actual interns, and these are just on the 115 counts, if the actual interns gave the defendant their actual names.  That's why I didn't make a motion to dismiss based on lack of jurisdiction.

I don't know what the evidence is going to be, but I suspect it will be that they did not give him their full names.  If they did not give him their full names, we're going to be arguing a Rule 29 that as a matter of law, the defendant can't be convicted of the 115 counts because it's our position that the cases indicate that for a 115 violation, you have to have an identifiable threat, an

```
 1   identifiable person as a target of your threat.
 2           THE COURT:  In other words, I'm just trying to
 3   better understand your argument.  I'm not challenging your
 4   argument.  Are you saying that you have to have a state of
 5   mind requirement that allows the jury to know that you were
 6   threatening someone who was definitinally covered by 115?
 7           MR. REED:  Correct, in order to be a true threat
 8   under 115, you have to have an identifiable victim.  You
 9   can't call, for example --
10           THE COURT:  I understand.  But is there a case that
11   specifically supports that?
12           MR. REED:  The Court can look at the Supreme Court
13   Elonis case, that's the most important case and that is cited
14   in, I believe, my instructions.  I should have that at hand
15   somewhere.
16           THE COURT:  Government must be aware of that case,
17   are you?
18           MR. TRISOTTO:  Your Honor, I'm familiar with the
19   case.  I don't believe it's cited in defendant papers.  I
20   believe that case really addresses the, um, it gets into
21   whether an objective standard is sufficient to prove
22   whether --
23           THE COURT:  I want that issue briefed by Thursday.
24   In other words, I want this argument briefed.  It seems like
25   the defendant is arguing that the case supports the
```

1    proposition that if the defendant didn't know who he was

2    speaking to, it doesn't allow a conviction even if the other

3    elements of Section 115 are met.

4              And, I guess, it could be argued that if you call a

03:38PM 5    congressional office, I don't know if you can presume that

6    the person who answers the phone is an employee.  It depends

7    upon perhaps testimony, if that's a prerequisite, how the

8    alleged victim identified themselves.

9              MR. TRISOTTO:  And, Your Honor, I'd be happy to

03:38PM10   brief that for you, but may I respond?

11             THE COURT:  Yes.

12             MR. TRISOTTO:  So the first thing I would like to

13   say is that the definition of a threat is very clear.  It was

14   defined in Virginia versus Black by the United States Supreme

03:39PM15   Court and nowhere in that definition does it include this

16   requirement that defense counsel is arguing for.  And I think

17   that's confirmed not only by that case which defines a

18   threat, but by the fact that all these proposed instructions

19   that both the model instructions, such as the modern federal

03:39PM20   jury instructions --

21             THE COURT:  You're right on that.  I have checked

22   those.  That is true, but I would still like it briefed.  You

23   may be correct, but I want it briefed.

24             MR. TRISOTTO:  And the only thing I'd add,

03:39PM25   Your Honor, I haven't found a case directly on point and I

have searched.  I did find one case, it's United States
versus Chase and that's a 9th Circuit case where the court
addresses a threat, a conviction under Section 115.

And the threat was made with respect to -- the
statement made was if the FBI are coming to my house, people
are gonna die.  And it's generally addressed to the term
people.  There's no identifiable target and the 9th Circuit
upheld that conviction.

THE COURT:  Okay, save your bullets.  I want to
read it and the issues that Mr. Reed raises are not
applicable to 875 it wouldn't seem.

And what about 223 A 47 United States Code?  What
are you making some argument, Mr. Reed, about the statute
itself, the language abuse, threaten or harass?

MR. REED:  Yes, Your Honor.

THE COURT:  Well, what is your argument there?

MR. REED:  I'll get to that in a second, but 875
it's our position there has to be an identifiable person.

THE COURT:  Same argument?

MR. REED:  The same argument.

Moving on to 223 --

THE COURT:  And would you be relying on the same
Supreme Court case.

MR. REED:  Yes, Your Honor.

With respect to the 223 arguments, our contention

is there needs to be a specific intent in order for a person

to be convicted of that.  The government disagrees.  There

are several predicate things that the person does when they

call up and --

03:41PM  THE COURT:  Let me just stop you for a moment.

When you say specific intent, you're contrasting that with a

general crime.  In other words, specific intent generally

means that the wrongdoer has to not only know that they're

doing an act, but they're knowing that the act violated the

03:42PM law.

MR. REED:  No.

THE COURT:  What are you arguing?

MR. REED:  Specific intent that I'm about is when

they're making the telephone calls, it's with an intent to

03:42PM invoke negative reaction in the victims that they're calling

and that is the Tobin case.

THE COURT:  So you're saying that just saying

abuse, threaten or harass would not enable the jury to make

that finding?

03:42PM  MR. REED:  They can make the finding if they also

find with respect to each of those predicates.  And by the

way, Your Honor, they need only find -- be unanimous on one

of the predicates.  They don't have to be unanimous on all of

the predicates.  But they in order to convict on any of the

03:42PM predicates, the Tobin case says that 223 requires a specific

1    purpose to cause an emotional upset in the person at the

2    telephone number called.

3              THE COURT:  I see.  So you're saying that that

4    statute requires a certain kind of abuse or a threat that

03:43PM 5    causes emotional upset?

6              MR. REED:  Right.

7              THE COURT:  How does the government respond?

8              MR. TRISOTTO:  The First Circuit case that defense

9    counsel's referring to is addressing a different subsection

03:43PM 10   of Section 223.  That subsection is A(1)(D).  And in A(1)(D),

11   the language, the specific intent that's required there is an

12   intent to harass.  The statute at issue here is a different

13   subsection.

14             THE COURT:  But it uses the word harass.

03:43PM 15             MR. TRISOTTO:  Correct, Your Honor, but in addition

16   the statute says intent to harass, abuse or threaten.  And

17   our objection and what we've been consulting with defense

18   counsel about is it's not necessarily to using the definition

19   he proposes with respect the term harass, it's that by

20   limiting us to that, he's eliminating the words abuse and

21   threaten.

22             Those have different definitions that require

23   different things.  So if we can, for instance, prove that

24   there was an intent to threaten which is a completely

25   different definition as established by, you know, like we

1 were talking about before with respect to Virginia versus

2 Black, that is another basis by which we can find a

3 conviction for the defendant or the jury could find a

4 conviction for the defendant.

5          But by limiting it to an intent to provoke adverse

6 reactions under the Tobin case, you're confining it to the

7 term harass.  And so the government would like to the extent

8 the defense counsel would like a definition, include

9 definitions for abuse and threaten as well.

10          THE COURT:  Say that last part again.

11          MR. TRISOTTO:  To include additional definitions.

12 To instruct the jury that they can find guilt for an intent

13 to harass with the definition defense proposes, but there's

14 other ways as well.  They could also find it through an

03:44PM15 intent to abuse and that term should be defined, and then

16 there should also be a definition for intent to threaten.

17          THE COURT:  Understood.

18          You also make a motion to bar the defendant from

19 self-serving prior statements.  Is there any indication

03:45PM20 that's what the intent is or is that just a cautionary

21 motion?

22          MR. DAHLQUIST:  I guess, in a sense it is a

23 cautionary motion, but also --

24          THE COURT:  Isn't that generally a rule in all

03:45PM25 criminal cases, I mean, self-serving statements by

1    defendants, even if they're part of a document that otherwise

2    is admissible are hearsay?

3            MR. DAHLQUIST:  Yes, Your Honor.  The only reason

4    that we thought to highlight it is because this case does

5    involve a lot of statements that the defendant made and that

6    the caller takers said in response.

7            THE COURT:  That raises another point.  If there is

8    an evidentiary basis for admitting some statements he made,

9    you're saying that these statements would be elicited by

10   counsel in counsel's -- defense counsel's examination of the

11   witness.  Is that the concern?

12           MR. DAHLQUIST:  Only to the extent they're

13   basically self-serving statements that aren't part of the

14   context.

03:47PM15        THE COURT:  But in order to evaluate whether

16   something is a genuine is threat or not, could the argument

17   be made that context is important?  And are you saying or

18   arguing that in order to create the context, the defendant

19   has to testify?

03:47PM20        MR. DAHLQUIST:  No, Your Honor.

21           THE COURT:  Then what are you saying?

22           In other words, if the cross-examiner, Mr. Reed

23   asked a witness, I'm making this up because it's extreme, but

24   just in an effort to make the point, after he said I'm going

03:47PM25   to threaten you, and then he said, I'm only kidding.  Don't

```
 1   me take seriously.  I use those terms maybe too easily.

 2   Would that be relevant to his state of mind?

 3              MR. DAHLQUIST:  Yes, Your Honor.

 4              THE COURT:  Can Mr. Reed introduce that?

03:48PM 5      MR. DAHLQUIST:  Yes, Your Honor.

 6              THE COURT:  Is that --

 7              MR. REED:  I think what the Court is concerned

 8   about the government's trial memorandum in which they're

 9   seeking to prevent Mr. Stahlnecker from testifying about the

03:48PM10  experiences that he's had fighting the Veteran's

11   Administration, they want to prevent that type of testimony.

12              THE COURT:  Well, are you intending to introduce

13   that?

14              MR. REED:  That's why he needs to testify to that

03:48PM15  because that's the reason he's making --

16              THE COURT:  I mean why is that relevant?  It's how

17   his statements it was perceived or how a reasonable juror

18   would perceive that statement that either satisfies or

19   doesn't satisfy the element of the crime.  I mean, people

03:49PM20  commit crimes for reasons they think are good.

21              MR. REED:  In the old days before the Elonis case,

22   we used to have these threat cases, a lot of them were

23   presidential threat cases the Court will recall.  And all the

24   government had to prove was whether or not that threat was --

03:49PM25  would a reasonable person believe that was a threat
```

objectively by looking at it after it's made.

But after the Elonis case, the Supreme Court indicated that the government now has to prove a specific intent of the defendant.  He has to have a specific intent to issue a true threat.  I say against an identifiable person, they say no, but there has to be an intent.  And in order for him to have intended threaten people, you have to look at the entire context of the evidence in the case.

And the evidence in the case is going to be why he's making these telephone calls.  He's not making them just to have fun and to harass and abuse people.  He's seeking help from the Veteran's Administration or help from congressmen and senators to help him change the law.

THE COURT:  But isn't the purpose of the statute to protect victims, the people who are on the other end of this?  They don't know about this man's history or what his motivation is.  They can only assess whether the threat appeared real to them and ultimately, whether the jury believes that a reasonable person would perceive the threat that way.

You're saying that even if the government satisfies those elements, there's still a defense in that the defendant could say my motivation was not to hurt anybody.  My motivation was to speak out about my injustice.

MR. REED:  Right, and to get help, somebody help

1   me.

2          THE COURT:  All right.  Let me get the government's

3   response.

4          MR. DAHLQUIST:  Yes, Your Honor.  Our response is

03:51PM 5   basically the concern that the Court raised is that the

6   statements -- it's not really a defense to say I had a good

7   reason for making these calls.

8          THE COURT:  But Mr. Reed, and I'm not conversant

9   with it at this moment, but I will be, this case that dealt

03:51PM 10   with threats on presidents and the Supreme Court changed the

11   landscape from just looking at the victim to looking at the

12   specific intent of the speaker, is that so?

13          MR. DAHLQUIST:  Yes, Your Honor, the specific

14   intent of the speaker is relevant.

03:52PM 15          THE COURT:  Well, then if it's relevant, then

16   you're saying that even under that requirement, the defendant

17   should not be allowed to tell the jury I wasn't trying to

18   threaten anybody.  I was just speaking out because I was

19   frustrated.

03:52PM 20          MR. DAHLQUIST:  Well, I think that is fair, Your

21   Honor.  What we don't --

22          THE COURT:  What is fair?

23          MR. DAHLQUIST:  That he can say I was speaking out

24   because I was frustrated.

03:52PM 25          THE COURT:  So he can talk about this VA background

UNITED STATES DISTRICT COURT

1    to some extent, not line and verse.  I mean, he can't get

2    into, you know, every complaint he made and every experience

3    he had where he felt the VA or some other entity didn't

4    respond appropriately, but you're agreeing that some of it is

03:53PM 5    relevant.

6              MR. DAHLQUIST:  Yes, Your Honor.

7              THE COURT:  All right.

8              MR. DAHLQUIST:  Your Honor, may I just follow-up

9    just quickly?

03:53PM 10             THE COURT:  Yes.

11             MR. DAHLQUIST:  The gripe goes back, I think all

12   the way to 1998.  You know, it's a long history from 1998

13   basically to the present, the defendant has engaged in maybe

14   not the way he would describe it as a battle with the VA.

03:53PM 15   And so what we don't want to have is this, you know, get into

16   all of this history.  And so I think what would be fair is

17   limiting it to the issues and things he raised in the call.

18             THE COURT:  How do you respond?

19             MR. REED:  No, Your Honor.  Here's a frustrated

03:53PM 20   person.  He's been fighting to get health care.  He's like a

21   boiler building up a pressure seeking help from the

22   government.  The VA is not helping him.  He's turning to

23   these congress people to help him.  The jury is entitled to

24   see the history.

03:54PM 25             And I don't intend to be long, Your Honor.  I'm

1    gonna put him on direct for about an hour to talk about

2    generally how he was in the Marines, how he had an injury,

3    how it wasn't addressed.  Some of the things he went through

4    to fight the VA, and then we're gonna try to bring it up to

03:54PM 5    the present to show why he was making these telephone calls

6    and he wasn't doing it for fun because he enjoyed it, but I

7    need to get that evidence in so that the jury can have

8    context.

9           THE COURT:  How then does the prior conviction

03:54PM 10   relate to that?  In other words, he was convicted in the past

11   of 875 or 223 which one was it?

12          MR. DAHLQUIST:  No, he was actually convicted in

13   federal court of a misdemeanor impeding a federal employee.

14          THE COURT:  That was the only conviction?

03:54PM 15          MR. DAHLQUIST:  Well, actually, he's got a few

16   convictions.  That was the one conviction in our District.

17   He also has the harassment conviction out of San Bernardino

18   county.

19          THE COURT:  Was that a telephone call?

03:55PM 20          MR. DAHLQUIST:  Yes, Your Honor.

21          THE COURT:  And what statute was used in that one?

22          MR. DAHLQUIST:  In the San Bernardino county --

23          THE COURT:  Oh, a state case?

24          MR. DAHLQUIST:  Your Honor, there was a 2016 state

03:55PM 25   case and then there was also a -- well, most recently it was

1    a 2017 conviction of a CFR, basically, a regulation that

2    prohibits people from impeding government employee.

3              THE COURT:  Was that telephone calls?

4              MR. DAHLQUIST:  Yes, that was telephone calls.

03:55PM 5        THE COURT:  Was that a felony conviction?

6              MR. DAHLQUIST:  No, Your Honor, it was misdemeanor,

7    but that conviction was overturned on appeal based on a

8    jurisdictional argument.

9              THE COURT:  Was that in this District?

03:55PM10        MR. DAHLQUIST:  Yes, Your Honor.  And basically

11   that was telephone calls, but the jurisdictional theory was

12   that he could be convicted under that statute for in-person

13   basically interfering with the government employee and so the

14   District Court reviewed that misdemeanor conviction

03:55PM15   overturned that conviction.

16              But then backing up, Your Honor, he had a 2016

17   conviction out of San Bernardino county for harassing calls

18   to the VA, and then he also has a 2014 conviction in the

19   Central District -- no, 2015 conviction in the Central

03:56PM20   District of California for the same conduct for harassing

21   calls to the VA.

22              THE COURT:  And those are felonies?

23              MR. DAHLQUIST:  All misdemeanors, Your Honors.

24              THE COURT:  Misdemeanors.  Even though they're

03:56PM25   within the 10-year framework, you're not intending to use

 1    those.

 2            MR. DAHLQUIST:  Not for our case-in-chief and for

 3    the purposes --

 4            THE COURT:  But, I mean, you intend to

03:56PM 5    cross-examine him with those misdemeanor convictions?

 6            MR. DAHLQUIST:  Yes, Your Honor.

 7            THE COURT:  On what basis?

 8            MR. DAHLQUIST:  Well, there's really two bases.

 9    First, if he is going to testify as to his intent, these

03:56PM10    convictions, this history, you know, if he's going to get

11    into the history, his history is relevant to show that he

12    intended to do the things that he was convicted of already

13    doing.

14            THE COURT:  But isn't that just using another

03:57PM15    conviction for a wrongful purpose?  In other words, you're

16    trying to support the knowledge requirement or specific

17    intent requirement with these misdemeanor convictions.

18            MR. DAHLQUIST:  So it's not for an impermissible

19    purpose because we're using it to prove intent, knowledge and

03:57PM20    lack of mistake.

21            THE COURT:  Intent and knowledge of what?

22            MR. DAHLQUIST:  Well, intent to harass because he

23    knows that this conduct is harassment because he's been found

24    guilty.

03:57PM25            THE COURT:  But how does that deal with the

1   argument that we just addressed?  That is even if the

2   defendant knows or reasonably should know that what he's

3   saying will effect the listener in a way that threatens or

4   intimidates or harasses the listener, he's still not guilty

03:58PM 5   of this crime because he didn't have the specific intent to

6   do that?

7         MR. DAHLQUIST:  Yeah, and I think the government's

8   response is that this evidence shows he has the specific

9   intent to do it because --

03:58PM 10        THE COURT:  But I mean how does it address his

11   argument that he's been abused by VA, and this was just

12   lashing out and not a genuine threat?

13        MR. DAHLQUIST:  Well, it shows -- it shows that he

14   knew this lashing out is criminal, that it is harassment,

03:58PM 15   that it is abusive.

16        THE COURT:  But that was a different statute.

17        MR. DAHLQUIST:  But they're still implicating the

18   same type of element.  So, for example, if it's impeding or

19   obstructing or the other statute is making terroristic

03:58PM 20   threats with the intent to terrorize, then it puts him on --

21        THE COURT:  How do you respond, Mr. Reed?

22        MR. REED:  Your Honor, they're trying to prove

23   simply the old adage because he did it then, he did it this

24   time.  We believe it's impermissible, that's it's not similar

03:59PM 25   404 B, that it's a misdemeanor-type violation.

1          THE COURT:  I want that issue briefed also in the

2     same pleading.  And I want the government to -- I want both

3     sides to brief that by Thursday.

4          MR. DAHLQUIST:  Your Honor?

04:00PM  5          THE COURT:  One moment.  Okay.

6          MR. DAHLQUIST:  Your Honor, while we're on this

7     same topic of basically the scope of cross-examination, there

8     are other things that I would like to ask the defendant about

9     that are not criminal convictions, but that would fall under

04:00PM 10    other wrongful conduct.

11          THE COURT:  Put those in your pleading.

12          MR. DAHLQUIST:  Very well, Your Honor.

13          THE COURT:  Give Mr. Reed -- the problem is if

14    you. . . I'll give you till, well, what other things do you

04:00PM 15    want to do?  Surface those now so Mr. Reed can anticipate

16    them and address them in his pleadings.

17          MR. DAHLQUIST:  Yes, Your Honor, and for the

18    Court's awareness, these are things that I put in letters

19    that were 404 B notice and whatnot so it shouldn't be new

04:01PM 20    information to Mr. Reed.  But I would also like to question

21    about other calls that occurred during this period, during

22    this general period.

23          THE COURT:  I was getting to that.  You say

24    something about wanting to use summaries of 10,000 to 15,000

04:01PM 25    phone calls made to government agencies from November 2018 to

1    November 2019.  And you have some summary of that pursuant to

2    Section 1006 of the Evidence Code.  What is that about?

3         MR. DAHLQUIST:  Your Honor, so the government

4    subpoenaed toll records for the phone numbers that were used

04:01PM 5    by Mr. Stahlnecker and conducting a review of the results,

6    identified among the numbers dialed over -- in an 11-month

7    span or 10-month span over 10,000 calls to government

8    entities.

9         THE COURT:  Well, what's the relevance of that?

04:02PM 10        MR. DAHLQUIST:  The volume of calls is relevant to

11   intent.

12        THE COURT:  How does Mr. Reed respond?

13        MR. REED:  That's 403, Your Honor, and we don't

14   know what the calls were about.  It just shows the

04:02PM 15   defendant's frustration.

16        THE COURT:  I'm inclined to sustain an objection to

17   that.

18        MR. DAHLQUIST:  Your Honor, may I make one more

19   point?

04:02PM 20        THE COURT:  Yes.

21        MR. DAHLQUIST:  As far as the call logs, the call

22   logs also show that with the vast majority of calls, the

23   caller dialed star 67 before dialing the number which I think

24   shows over the course of 10,000 calls that it was deliberate

04:03PM 25   and not a lack of mistake to conceal his identity across the

1    spectrum of calls.

2            THE COURT:  I mean, why is his identity important?

3    You think that shows the threat is more relevant?

4            MR. DAHLQUIST:  Yes.

04:03PM 5        THE COURT:  How would the listener know that?

6            MR. DAHLQUIST:  So two things.  One, Your Honor, is

7    when a caller dials star 67, it shows up on their phone as

8    blocked number.  And so if you're a government agency and

9    your caller identification device typically picks up a

04:03PM 10   caller's phone number and name, this would be unusual.

11           THE COURT:  Well, did the witnesses say they picked

12   it up?

13           MR. DAHLQUIST:  I'm sorry, Your Honor?

14           THE COURT:  Do the witnesses say that, the alleged

04:03PM 15   victims, do they -- will they testify that when they picked

16   up the call, they observed that?

17           MR. DAHLQUIST:  They will testify to what they

18   observed on the call identification feature.

19           THE COURT:  The 67 feature or something.

04:03PM 20           MR. DAHLQUIST:  It said some words to them that

21   indicated that it may have been a blocked number.  Something

22   with internal routing.

23           THE COURT:  They will not say they identified it

24   with this person, will they?

04:04PM 25           MR. DAHLQUIST:  For the most not based on the phone

```
 1    numbers.  Some of the callers were familiar with the callers

 2    based on the number of calls.

 3            THE COURT:  I mean, some of the witnesses will say

 4    they recognized his voice?

 5            MR. DAHLQUIST:  That's correct, Your Honor.

 6            And, Your Honor, one more point about the volume of

 7    calls.  I think it's important to provide the context and

 8    also to provide context to some of the witness's testimony.

 9    So, for example, one of the witnesses will testify that --

10    and in fact there's a recording of defendant saying hey, you

11    know, throughout this entire month, you know, you've been

12    harassing me.  This is what the defendant says to the call

13    recipient during the entire month of September and so the

14    call logs showing number of calls in September --

15            THE COURT:  Say that again.  The defendant said

16    something to the listener about the listener harassing the

17    defendant?

18            MR. DAHLQUIST:  That's correct, Your Honor, and he

19    talks about the call history, you know, that basically

20    references prior calls during the prior month.

21            THE COURT:  I mean, Mr. Reed, I'm not in your

22    shoes, I'm just trying to appropriately make in liminae

23    rulings.

24            MR. REED:  There are some problems.

25            THE COURT:  You know sometimes you ought to think
```

1      twice about these things.  In other words, why wouldn't it be

2      helpful to you as part of your approach to have the jury hear

3      that he made 10 to 15,000 calls?  Doesn't that fit into your

4      defense that he's just lashing out and never meant any of

04:06PM 5      these things?

6              MR. REED:  It can be taken two ways, Your Honor.

7      500 calls, yes.  10,000 calls the jury's gonna have a

8      problem.  They're gonna be prejudiced by that massive number.

9              THE COURT:  That's an appropriate argument you're

04:06PM 10     making.

11             MR. REED:  The second thing is, Your Honor, that

12     the government's trying to I think infer that when

13     Mr. Stahlnecker pressed 67 before he made a telephone call,

14     he did that in order to block his number so that he couldn't

04:06PM 15     be identified, but it didn't happen that way.

16             What happened was the federal government, the

17     officers, the investigators who were working on this case

18     identified Mr. Stahlnecker a long time ago as a person who

19     makes these repeated calls for help and they arranged with

04:07PM 20     Verizon, the actual company, to place blocks on his telephone

21     numbers so that he couldn't call under the Washington area

22     code.

23             THE COURT:  When did the internal investigators

24     realize these calls were coming from defendant?

04:07PM 25             MR. REED:  They've known about Mr. Stahlnecker for

several years, Your Honor.

THE COURT:  I mean, was that made known to other people in the congressional or senate offices?

MR. REED:  I think the congressional people were the ones who contacted them and said to the agents they need to do something.

THE COURT:  Was that made known to the staffers?

In other words, if the staffers were told for instance that there's this person who makes these calls and he's been making these kind of calls forever, don't be that concerned.

MR. REED:  No, no, Your Honor.

THE COURT:  There's nothing like that?

MR. REED:  Nothing like that because when they receive these telephone calls, it say doesn't say block 77. This is Mr. Stahlnecker who's making the call.  A lot of people use 67 in order to call in.

THE COURT:  I'm not familiar with that.  This is a way to block calls is that it?

MR. REED:  It's a way for the person to -- who is calling somebody to call somebody without them know what your telephone number is, what the phone number is you're calling from if you hit star 67.

So what the government did was they saw that Mr. Stahlnecker was making all these telephone calls and they

asked Verizon to make sure his calls are blocked or prevented

from being called to Washington unless he has to dial 67

first.  So they were the ones who compelled him to place the

67 before the telephone numbers on the 202 area codes at

least.

We don't want to get into a collateral issue in

front of the jury and have Mr. Stahlnecker testify to that

nor do we want to at least in my opinion have Mr. Stahlnecker

talk about many of the 10,000 calls that he made.  I'm sure

the government wants to introduce 10,000 against him.  I'd

like to streamline the direct examination and get right to

the actual calls that are the subject of this case not 10,000

calls.

THE COURT:  All right.  I've covered most of the

issues I wanted to address.  I'll have another pretrial

conference on Monday after I have reviewed your pleadings.

That further pretrial conference will be at 1:30.

MR. DAHLQUIST:  Very well, Your Honor.

MR. REED:  Your Honor, there are just a couple

other minor issues I wanted to raise with the Court.  We

might as well bring them up now.

THE COURT:  Okay.

MR. REED:  And that is the government intends to

introduce evidence with respect to the 115 counts with

respect to Congressman Speir that when Mr. Stahlnecker called

1    in and spoke to the intern, that the intern then turned to

2    her bosses and told the bosses what she had heard over the

3    telephone.  And in response to that, the bosses took

4    precautions to prevent a frontal assault at the front

04:11PM 5    location of the offices from some person that might come with

6    a gun and attack the office and made arrangements for the

7    employees to go just in and out from the back door.

8            THE COURT:  There are two parts to what you're

9    addressing.  One is the excited utterance exception or

04:11PM 10    related state of mind of exception and the instructions that

11    the official gave afterwards.  I would agree that what the

12    official may have said by way of further precautions is not

13    relevant because that goes to official state of mind.

14            But if there is evidence that at the time the

04:12PM 15    listener in this case, this intern in ^Congresswoman Spire's

16    office establishes that within earshot of someone she made

17    her excited utterance or present state explanation depending

18    upon how it's presented, it could meet the hearsay exception.

19            MR. REED:  Very well, Your Honor.

04:12PM 20            The other thing I wanted to raise with the Court is

21    that the Court has known me for many years and I don't like

22    to use foul language in the court.  This is the kind of case

23    I think where both sides are gonna be required to

24    cross-examine or use foul swear words.

04:13PM 25            THE COURT:  I'm sufficiently modern, you know.  I

```
 1   think all the gloves are off after watching the halftime show
 2   at the Super Bowl yesterday.
 3          MR. REED:  So the Court would permit me to use C
 4   word, the four letter C word whose first two letters are C
 5   and U?
 6          THE COURT:  If it was used, it was used.  I mean,
 7   you know, we're jurists.  We're not priestly.
 8          MR. REED:  And the last thing I wanted to bring up
 9   with the Court is sometimes the government rests well before
10   a recess.  And I was hoping the Court would allow me to
11   simply at that point in time just indicate before I start my
12   case that the defense would like to make a motion over the
13   recess as code language for a Rule 29 so that I don't
14   interrupt the flow.
15          THE COURT:  Yes, you can.  I'll tell you that you
16   can say I want to make a motion.  Jury has no idea about
17   that.  I'll say we can hear it later and you will know that
18   by doing that, you preserve your record, and then we can hear
19   your motion outside the presence of the jury.
20          MR. REED:  Thank you, Your Honor.
21          MR. DAHLQUIST:  Your Honor, may I be heard on the
22   reactions of the supervisor to basically the report of the
23   threat.
24          THE COURT:  Well, I mean, I have to wait to hear
25   it.  What is the supervisor going to say?
```

1          MR. DAHLQUIST:  Well, the supervisor is gonna say

2     that based on report made to him, he took precautions.  For

3     example, they turned off the lights in the front office, they

4     instructed staff to use the back door.

04:14PM 5          THE COURT:  Was the report made to the supervisor,

6     the particular supervisor, at the time the listener heard the

7     message?

8          MR. DAHLQUIST:  In close proximity, Your Honor.

9          THE COURT:  What does that mean?

04:15PM 10          MR. DAHLQUIST:  It means the call came in at 4:06

11     is when she hung up and she walked right into office with her

12     notes in her hand and said hey, this is what just happened.

13          THE COURT:  And how much after?  How many minutes?

14          MR. DAHLQUIST:  I suspect it's gonna be immediately

04:15PM 15     that she hung up and she walked into the supervisor's office.

16          THE COURT:  And she wrote down what happened?

17          MR. DAHLQUIST:  She took notes about the words that

18     were stated, and then she transcribed the notes into an

19     email.  She no longer has the original notes.

04:15PM 20          THE COURT:  Just one moment.

21          MR. DAHLQUIST:  Yes, Your Honor.

22          THE COURT:  The way you're describing it, it would

23     seem that it might not pass the test of an excited utterance,

24     but it might survive then existing mental or emotional

04:16PM 25     reaction.  How would you argue that point, Mr. Reed?

1      MR. REED:  Your Honor, my understanding of the way

2   it occurred was the intern after hearing the telephone call

3   was making notes of what the call was.  There was no tape

4   recorder for example.  And then making notes of what the

04:16PM 5   actual words were, she took these words on a piece of paper

6   to the supervisor.  At that point the supervisor took

7   precautions.  And it doesn't seem to me to be an excited

8   utterance where the intern is screaming that she's in fear.

9      THE COURT:  It doesn't appear to me on what was

04:17PM 10   said to be an excited utterance, but how would argue the

11   alternative ground that it does satisfy the present mental

12   state, that existing mental or emotional state?  In other

13   words, something less than excited utterance, but close in

14   proximity.

04:17PM 15      MR. REED:  The present mental state is something

16   that's relevant as to the victim.  What was her present

17   mental state.  That's going to be the issue.  I don't think

18   the issue is the present mental state of the boss who took

19   precautions to go close the door and turn out the lights.

04:18PM 20      THE COURT:  It would be, I mean the fact that she

21   wrote this down and went to her boss, what if he says when

22   she came to my office, she was in tears or frazzled or

23   whatever, I haven't heard that foundation.  Is that something

24   that he will say?

04:18PM 25      MR. DAHLQUIST:  He will describe her demeanor and

1    he will describe her as being upset.  And based on his

2    working relationship with her, that she presented as being

3    flustered or anxious.

4           THE COURT:  What will she say?  What will the

04:19PM 5    actual alleged victim say?

6           MR. DAHLQUIST:  I think she will say that she's

7    generally a person that is very composed and so she wasn't

8    frantic or crying, but that this definitely had an impact on

9    her and that she was still impacted when she was speaking to

04:19PM10    her supervisor.  And her supervisor, you know, after we lay

11    foundation of how long they worked together and like

12    observing this employee's demeanor over years that he

13    recognized that her demeanor --

14           THE COURT:  Put that in your pleading, too.

04:19PM15           MR. DAHLQUIST:  Very well, Your Honor.

16           THE COURT:  All right.  Then we'll see you again

17    Monday 1:30.

18           MR. DAHLQUIST:  Your Honor, one more thing.  As far

19    as the reaction of the supervisor, may I be heard on that,

04:19PM20    just the relevance of that?

21           THE COURT:  Put that in your pleading.

22           MR. DAHLQUIST:  Very well, Your Honor.

23           MR. REED:  Thank you, Your Honor.

24           (Proceedings were concluded at 4:19 p.m.)

25

1

2                          CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES      )

5                               )  SS.

6    STATE OF CALIFORNIA        )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  SEPTEMBER 3, 2020

19

20      /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25